# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| Center for Community Self-Help, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:21cv862 |
| | ) | |
| Self-Financial, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiff Center for Community Self-Help initiated this action against Defendant Self Financial, Inc. alleging trademark infringement under 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), trademark infringement and unfair competition under North Carolina common law, and unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1. (ECF No. 1 ¶¶ 46–87.) Before the Court is Defendant's Motion to Dismiss for lack of personal jurisdiction and improper venue under Federal Rules of Civil Procedure 12(b)(2) and (3), or in the alternative for transfer of venue pursuant to 28 U.S.C. §§ 1404(a) or 1406(a). (ECF No. 15.) For the reasons that follow, the Court will deny Defendant's motion.

## I.    BACKGROUND

According to the Complaint, Plaintiff is a North Carolina corporation with its principal place of business in Durham, North Carolina. (ECF No. 1 ¶ 1.) Plaintiff is an umbrella organization for a group of affiliated organizations that provide "financing, technical support, consumer financial services, and advocacy" for the public. (*Id.* ¶¶ 8, 9.) Since 1980, Plaintiff

and its affiliates have used a "SELF-HELP" mark in connection with their business and services.  (*Id.* ¶ 12.)

Defendant is a Delaware corporation with a principal place of business in Austin, Texas.  (*Id.* ¶ 2.)  Defendant is in the business "of providing loans to individuals who need assistance in establishing credit history and accessing mainstream financial products." (*Id.* ¶ 31.)  In 2019, Defendant began using a "SELF" mark in connection with its services, including on its website, www.self.inc.  (*Id.* ¶¶ 32–34.)

Plaintiff alleges that Defendant's "SELF" mark is confusingly similar to Plaintiff's "SELF-HELP" mark, (*id.* ¶ 36), and has caused actual confusion among consumers, (*id.* ¶ 52). Plaintiff also alleges that since Defendant began using the "SELF" mark, thousands of consumers attempting to contact Defendant have called Plaintiff's customer support center in error, and that the volume of these calls has disrupted Plaintiff's business.  (*Id.* ¶ 41.) Therefore, Plaintiff initiated this action.

Turning to Defendant's motion, the Court will address Defendant's arguments for dismissal under Rule 12(b)(2) and (3) first, and then will address the question of transfer.

## II.    PERSONAL JURISDICTION AND VENUE

### A.    Standards of Review

#### 1.    Rule 12(b)(2)

A challenge to personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure is a question of law, and the plaintiff bears the ultimate burden of proving jurisdiction.  *See Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016); *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).  The plaintiff's burden of proof "varies according to the [procedural] posture of [the] case and the evidence that has been presented to the court."  *Grayson*, 816 F.3d at 268.

Where the court decides a pretrial personal jurisdiction question without conducting an evidentiary hearing—"reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint"—a plaintiff "need only make a prima facie showing of personal jurisdiction" to withstand a jurisdictional challenge. *Id.* "[A] plaintiff makes a prima facie showing of personal jurisdiction by presenting facts that, if true, would support jurisdiction over the defendant." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 561 (4th Cir. 2014) (citing *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003)). The court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Id.* at 558 (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)).

### 2. Rule 12(b)(3)

"When an objection to venue has been raised under Rule 12(b)(3), the burden lies with the plaintiff to establish that venue is proper in the judicial district in which the plaintiff has brought the action." *Plant Genetic Sys. v. Ciba Seeds*, 933 F. Supp. 519, 526 (M.D.N.C. 1996) (citing *Bartholomew v. Va. Chiropractors Ass'n*, 612 F.2d 812, 817 (4th Cir. 1979)). A plaintiff is only obliged to make a prima facie showing of proper venue in order to survive a motion to dismiss under Rule 12(b)(3). *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365–66 (4th Cir. 2012) (citing *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004)). In determining whether such a showing has been made, the Court must "view the facts in the light most favorable to the plaintiff." *Id.*

### B. Personal Jurisdiction

"The Due Process Clause of the Fourteenth Amendment constrains a state's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277,

283 (2014) (citation omitted). A federal district court can exercise personal jurisdiction over a nonresident defendant only if "(1) such jurisdiction is authorized by the long-arm statute of the state in which the district court sits; and (2) application of the relevant long-arm statute is consistent with the Due Process Clause of the Fourteenth Amendment." *Universal Leather*, 773 F.3d at 558. North Carolina's long-arm statute "permits the exercise of personal jurisdiction . . . to the outer limits allowable under federal due process." *Id.*; *Dillon v. Numismatic Funding Corp.*, 231 S.E.2d 629, 630 (N.C. 1977) (holding that, by enacting North Carolina's long arm statute, the North Carolina General Assembly "intended to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process"). The two-prong test, therefore, "merges into [a] single question," allowing the court to proceed directly to the constitutional analysis. *Universal Leather*, 773 F.3d at 558–59.

Under the Due Process Clause of the Fourteenth Amendment, two paths permit a court to exercise personal jurisdiction over a nonresident defendant. *Id.* at 559. One path is general jurisdiction, "which permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit." *Walden*, 571 U.S. at 283 n.6. The other path is specific jurisdiction, which "depends on an 'affiliatio[n] between the forum and the underlying controversy.'" *Id.* (alteration in original) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

Here, the parties present arguments regarding both general and specific jurisdiction. (ECF Nos. 16 at 9–16; 21 at 10–22; 25 at 3–9.) For each type of jurisdiction, the parties' arguments focus on Defendant's interactions with North Carolina and North Carolina residents carried out via a website and mobile phone application operated by Defendant. (ECF Nos. 16 at 9–16; 21 at 10–22; 25 at 3–9.) The Court will first address general jurisdiction and

Case 1:21-cv-00862-LCB-LPA   Document 27   Filed 02/06/23   Page 4 of 24

then specific jurisdiction. Ultimately, the Court finds that although it lacks general jurisdiction, Plaintiff has established a prima facie case of specific jurisdiction over Defendant.

### 1. General Jurisdiction

"A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop*, 564 U.S. at 919. A corporation's "place of incorporation and principal place of business" are the "paradigm" bases for general jurisdiction. *Daimler A.G. v. Bauman*, 571 U.S. 117, 137 (2014). Only in an "exceptional case" will a corporation's operations render it "at home" in a state other than its place of incorporation or principal place of business. *Id.* 571 U.S. at 139 n.19. In such an "exceptional" case, the corporation would have contacts with a state "comparable to a domestic enterprise in that State." *Est. of Thompson v. Mission Essential Pers., LLC*, No. 11-CV-547, 2014 WL 4745947, at *2 (M.D.N.C. Sept. 23, 2014) (quoting *Daimler*, 571 U.S. at 758 n.11). Additionally, in the Internet context, general jurisdiction over a defendant cannot be predicated on "numerous and repeated electronic connections with persons [in a state]" without "something more," as "such transmissions do not add up to the quality of contacts necessary for a State to have jurisdiction over the person for all purposes." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 715 (4th Cir. 2002).

Here, Defendant is a Delaware corporation and has its principal place of business in Texas, (ECF No. 1 ¶ 2), so it is not paradigmatically at home in North Carolina. Nevertheless, Plaintiff contends that general jurisdiction exists because "nearly one million individuals in North Carolina have accessed Defendant's website," and Defendant has "approximately 90,000 ongoing customer relationships with North Carolina residents." (ECF No. 21 at 10-

5

11.) However, these numbers represent only numerous and repeated electronic connections with persons in North Carolina. They do not demonstrate that Defendant conducts any activities in North Carolina that are domestic in nature. Accordingly, the Court finds that it lacks general jurisdiction over Defendant.

### 2. Specific Jurisdiction

Specific jurisdiction requires "that the relevant conduct have such a connection with the forum state that it is fair for the defendant to defend itself in that state." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). A court may exercise specific jurisdiction when "the defendant has purposefully directed [its] activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (internal quotations and citation omitted).

The Fourth Circuit employs a three-prong test to determine whether the exercise of specific jurisdiction is appropriate: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Universal Leather*, 773 F.3d at 559 (quoting *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 302 (4th Cir. 2012)).

The Court will address each prong of this test in turn.

### a. Purposeful Availment

The Fourth Circuit has held that purposeful availment can be satisfied in the Internet context where a defendant "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, [if] (3) that activity creates,

6

in a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan*, 293 F.3d at 714.

The Fourth Circuit's *ALS Scan* test is based on a model for measuring electronic engagement set out in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997). *ALS Scan*, 293 F.3d at 713. Under the *Zippo* model, "the likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." 952 F. Supp. at 1124. According to *Zippo*, the nature and quality of commercial activity on the Internet can be measured using a "sliding scale" of website interactivity. *Id.* At one end of the scale, a "passive" site that "does little more than make information available" will not support jurisdiction. *Id.* In contrast, if a defendant "clearly does business over the Internet" by "enter[ing] into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files," then "personal jurisdiction is proper." *Id.*

Although *Zippo* emphasized website interactivity, the Fourth Circuit has cautioned that when a court applies the *ALS Scan* test, while "[t]he interactivity of a website" as measured on the *Zippo* scale is a "jurisdictionally relevant fact," the court should not "attach too much significance on the mere fact of interactivity" at the expense of "losing sight of the key issue in a specific jurisdiction case—whether 'the defendant has *purposefully directed* [its] activities at residents of the forum.'" *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 141–42 (4th Cir. 2020) (quoting *Burger King*, 471 U.S. at 472). Thus, while a high degree of website interactivity is probative of personal jurisdiction, it is not dispositive. *See UMG Recordings, Inv. v. Kurbanov*, 963 F.3d 344, 353 (4th Cir. 2020) ("Whether the [w]ebsites are highly interactive or semi-interactive . . . is not determinative. . . .").

Here, each party addresses the first two *ALS Scan* prongs (direction and intent) simultaneously based on (1) the level of interactivity of Defendant's online presence, (2) the number of visitors that Defendant's website receives from North Carolina, and (3) the amount of business that Defendant does in North Carolina. (*See* ECF Nos. 16 at 11–15; 21 at 11–18; 25 at 5–6.) With respect to the third *ALS Scan* prong (creation of a cause of action), the parties dispute how to associate alleged online trademark infringement with any one specific state. (ECF Nos. 16 at 16; 21 at 18–19; 25 at 8.)

The Court will begin its *ALS Scan* analysis by addressing the first two prongs of the test together. *See Young v. New Haven Advocate*, 315 F.3d 256, 263 (4th Cir. 2002) (noting that under the circumstances, "the *ALS Scan* test work[ed] more smoothly when parts one and two of the test [were] considered together"). In addressing these prongs, the Court will start by assessing the interactivity of Defendant's website. This assessment of interactivity will allow the Court to gauge how the Defendant generally uses electronic activity in its business and for what purpose. Then, to measure the extent to which Defendant purposefully directs that electronic activity at North Carolina, the Court will analyze the quantity and quality of Defendant's online interactions with North Carolinians specifically. The resolution of these two inquiries will demonstrate whether Defendant directs electronic activity into North Carolina with the manifested intent of engaging in business or other interactions within North Carolina.

Regarding interactivity, Defendant argues that its online presence is only "semi-interactive" and thus falls in the middle of the *Zippo* scale. (ECF No. 16 at 12.) Plaintiff contends that Defendant's website and mobile app are "highly interactive," and specific jurisdiction therefore exists pursuant to *Zippo*. (ECF No. 21 at 5, 14.) To support this

8

characterization, Plaintiff has submitted screenshots of Defendant's website and mobile phone app, as well as a declaration describing how one navigates through the website and app, and some of the features pictured in the screenshots. (*See* ECF Nos. 23; 23-1 through 23-13).

Based on a review of the screenshots of the Defendant's website and app—which the Court will treat as a single "website"—the Court finds that Plaintiff has made a prima facie showing that Defendant's online platform is highly interactive on the *Zippo* scale.

The screenshots show that Defendant allows potential customers to sign up for an account with Defendant online, and then to apply for a loan online. (*See* ECF Nos. 23-13 at 2–9 (showing pictures of signup process); 23-5 at 2 ("Many customers are able to join . . . in less than five minutes . . . . Basically, you'll sign up, select your loan terms, enter your payment information and answer some security questions to verify your identity.").) As depicted in Plaintiff's screenshots, the instructions on Defendant's website do not mention any method of signing up with Defendant offline. (*See* ECF Nos. 23-1; 23-4; 23-5; 23-11 at 5–6; 23-13.) Once a customer has a loan from Defendant, the customer makes monthly payments. (ECF No. 23-12 at 2.) Again, this is done online—Defendant's payment instructions only address online payments through an account portal and explicitly state that Defendant does not accept forms of payment such as checks, money order, cashier's checks, "or similar method[s]." (*Id.*) When a customer pays off a loan from Defendant, Defendant encourages customers to take out another loan from Defendant, a transaction which will presumably also take place online. (ECF No. 23-4 at 2 ("[B]e sure to continue building credit either through another Self loan or other credit-building option.").)

The features of Defendant's website described above all support that Defendant forms contracts with consumers via repeated online exchanges and thus "clearly does business over

the Internet." *Zippo*, 952 F. Supp. at 1124. Indeed, Defendant's apparent lack of offline methods of business supports that Defendant *primarily* does business over the Internet. Accordingly, the materials Plaintiff has submitted make a prima facie showing that Defendant's website demonstrates a manifested intent of engaging in online business. However, the *ALS Scan* test will not be satisfied unless this business-oriented electronic activity is directed at North Carolina. The Court therefore now turns to the volume of traffic and business that Defendant's online operations receive from North Carolina specifically.

According to a declaration submitted by Defendant, "[a]s of year-end 2021, [its website] was visited over 18 million times," and "[a]pproximately 5% of those visits were from consumers in North Carolina." (ECF No. 17 ¶ 19.) Also "[a]s of year end 2021, [Defendant] had almost 2 million customers nationwide, with less than 4.5% of those customers from North Carolina," and "approximately 4.5% of [Defendant's] revenue was attributable to North Carolina consumers." (*Id.* ¶¶ 20–21.)

Defendant describes its statistics showing it has only "limited and sporadic" and "*de minimis*" contacts with North Carolina consumers. (ECF No. 16 at 12–13.) Plaintiff, however, characterizes the same numbers differently. (ECF No. 21 at 17–18.) Plaintiff calculates that 4.5% of 2 million customers is 90,000, and that it is this latter number—90,000 customers—that the Court should focus on, rather than 4.5%. (*Id.*) Plaintiff has also attempted to calculate what 4.5% of Defendant's revenue is; Plaintiff estimates it may be somewhere between $450,000 and $1,900,000. (*Id.*) In Plaintiff's view, these are large numbers that support a finding that the first two *ALS Scan* prongs are satisfied. (*Id.* at 18.) Defendant responds to Plaintiff's calculations by contending that "courts consistently consider and rely upon the percentages of a party's business in a particular forum, not the total numbers that those

10

percentages represent." (ECF No. 25 at 5–6.) However, Defendant has not cited any Fourth Circuit case for this proposition. (*Id.*)

This Court declines to look only at percentages. In the Internet context, courts do not "consistently" consider percentages rather than total numbers. For example, in *Zippo*, the court recited in the background section of its opinion that "[a]pproximately two percent (3,000) of [the defendant's] subscribers [were] Pennsylvania residents." 952 F. Supp. at 1121. However, when the *Zippo* court analyzed the facts of the case, it focused on the number 3,000 rather than on the 2% figure. *Id.* at 1126 ("[Defendant] has contracted with approximately 3,000 individuals . . . ."). Likewise, in *UMG Recordings*, a recent Fourth Circuit case applying the *ALS Scan* test, the Fourth Circuit followed this same pattern. 963 F.3d at 349, 353. In *UMG Recordings*, the Fourth Circuit initially recited facts including that one international website received 500,000 visitors from Virginia (representing about 2% of all visitors to that website from the United States), and another website received 95,000 visitors from Virginia (also representing about 2% of the website's United States-based traffic). *Id.* at 349. When the court later analyzed these figures, it stated that there were "plentiful" contacts with Virginia because the websites together had received "more than half a million unique visitors" from Virginia during the relevant time period. *Id.* at 353. Thus, there is no rule that a court must focus on percentages. *See Rice v. PetEdge, Inc.*, 975 F. Supp. 2d 1364, 1371 (N.D. Ga. 2013) ("Defendant's argument would essentially turn the purposeful availment inquiry into a question of sales percentages, introducing the kind of mechanistic determinations into the jurisdictional inquiry that the Supreme Court [has] warned against . . . ." (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945))).

That said, in this case both the total numbers and percentages support that Defendant directs its electronic activity into North Carolina.

First, 90,000 North Carolina customers is a large enough number to infer that Defendant, which operates principally online, purposefully directed electronic activity at North Carolina. *See Savvy Rest, Inc. v. Sleeping Organic, LLC*, No. 18-CV-30, 2019 WL 1435838, at *5 (W.D. Va. Mar. 29, 2019) (finding that defendant's use of a website to sell "over 80 mattresses to residents of Virginia and generate more than $200,000" in gross sales was purposeful availment of the privilege of conducting business in Virginia and collecting similar cases); *see also Thousand Oaks Barrel Co. v. Deep S. Barrels LLC*, 241 F. Supp. 3d 708, 716 & n.6 (E.D. Va. 2017) (collecting cases where "courts have persuasively concluded that personal jurisdiction exists . . . where the defendant has a national interactive e-commerce website that generates a small amount of e-commerce sales in the forum state"). The alternative—that Defendant achieved 90,000 North Carolina customers *without* directing electronic activity into North Carolina—is implausible.

As for percentages, while 4.5% is only a single-digit percentage, Defendant's website states that Defendant provides services "in all 50 states." (ECF No. 23-2 at 6.) If Defendant's business were equally distributed across all 50 states, it would have only 2% of its business in every state. With that in mind, 4.5% appears to be a large share of business, and this in turn also supports that Defendant directed its online activity into North Carolina to build business in this state.[1] *See Market Am. v. Optihealth Prods., Inc.*, 07-CV-855, 2008 WL 5069802, at *7

---

[1] The Court has not accounted for North Carolina's share of the total United States population in this analysis. It is possible to use percentages to make a number of contacts seem large or small by selectively applying adjustments. This is a reason to avoid relying exclusively on them. The Court also notes that percentages may be misleading in a specific jurisdiction analysis because as one state's percentage share of a company's business rises, another state's will fall (even if the company is conducting progressively more business and accumulating more contacts in the latter state).

12

(M.D.N.C. Nov. 21, 2008) (explaining that North Carolina's 3% share of defendant's sales weighed in favor of finding purposeful availment because the defendant made sales in all fifty states and worldwide, making North Carolina one of defendant's "better customers"), *report and recommendation adopted*, 07-CV-855, 2009 WL 10715396 (M.D.N.C. Jan. 6, 2009); *see also UMG Recordings*, 963 F.3d at 349, 353 (noting that Virginia's 2% share of domestic visitors to websites made it rank 11th among states in terms of visitors, and that this supported personal jurisdiction in Virginia); *Thousand Oaks Barrel Co.*, 241 F. Supp. 3d at 717 (noting that "[c]aselaw persuasively contradicts [the] argument" that having only a small percentage of total sales going to a state defeats purposeful availment).

In sum, there is evidence that Defendant operates a highly interactive website, and that Defendant conducts a large volume of business in North Carolina via this website. These points together support finding that the first two *ALS Scan* prongs—that a defendant "direct[ed] electronic activity" into a state with the "manifested intent of engaging in business or other interactions" within that state—are satisfied. 293 F.3d at 714. Accordingly, the Court finds that Plaintiff has successfully made the required prima facie showing for the first two *ALS Scan* prongs.[2]

---

[2] Defendant has also argued that its website does not direct electronic activity at North Carolina because it is "directed at a national audience. (ECF No. 16 at 12.) What Defendant means by "directed at a national audience" is that its website "does not contain content specifically directed at North Carolina" and is "accessible and downloadable by consumers around the country." (*Id.*) However, a website's high degree of national accessibility (i.e., the degree to which anyone in the country can access and experience a website in the same way as a person anywhere else in the country) has no obvious inverse relationship to the degree to which the website operator directs electronic activity into a state. If a website contained features available only to North Carolinians, that would support that the website was directed at North Carolina, but the lack of such features does not necessarily support that the website is *not* directed at North Carolina. *Cf. Rice*, 975 F. Supp. 3d at 1371 ("[T]he fact that a website does not target the forum state might reinforce an overall lack of sufficient contacts to support purposeful availment. But it is not a dispositive factor." (internal citation omitted)); *Thousand Oaks Barrel Co.*, 241 F. Supp. 3d at 716–17 ("The lack of ads targeted at Virginia also does not change the fact that [defendant] used its website to reach into Virginia to do business there.").

13

The Court now turns to the third *ALS Scan* prong—whether Defendant's electronic activity directed at North Carolina with the intent of engaging in business in North Carolina also creates in a person within North Carolina a potential cause of action cognizable in North Carolina's courts. *See ALS Scan*, 292 F.3d at 714. As mentioned previously, the parties' dispute regarding this prong centers on how to associate online trademark infringement with a specific forum. Defendant claims that its alleged acts occur in Texas where its employees, documents, and infrastructure are located, and thus no cause of action arises in North Carolina. (ECF No. 16 at 16.) Plaintiff claims that its injury consists of consumers being confused by an infringing trademark and this confusion is occurring where the consumers are located; as there are allegedly confused consumers across the country, including North Carolina, Plaintiff argues that a cause of action arises in North Carolina. (ECF No. 21 at 18–19.)

In online trademark infringement cases, courts have often found that "by using [a] [p]laintiff's trademark to capture potential customers" from a state, a defendant creates a cause of action in that state. *Market Am.*, 2008 WL 5069802, at *7.[3] Notably, in *Carefirst of Maryland*, an online trademark infringement case, although the Fourth Circuit found that the Chicago-based defendant's activities did not satisfy the first two *ALS Scan* prongs, the court nevertheless commented that "a substantial portion of the injuries that [the plaintiff] alleged were suffered in [Maryland]" since many of the plaintiff's customers resided in Maryland. 334 F.3d at 401. Moreover, *Zippo* was an online trademark infringement case as well, and the *Zippo*

---

[3] *See also Savvy Rest*, 2019 WL 1435838, at *6 (finding that a claim arose out of online forum-related activities because the claim was "based . . . on false or misleading representations on the website that [defendant] use[d] to sell mattresses in Virginia and compete with the plaintiff"); *Cole-Tuve, Inc. v. Am. Mach. Tools Corp.*, 342 F. Supp. 2d 362, 368 (D. Md. 2004) (finding third *ALS Scan* prong satisfied in online trademark infringement case, and drawing comparison between defendant's alleged online actions and physically going into Maryland and installing misleading road signs); *Graduate Mgmt. Admission Council v. Raju*, 241 F. Supp. 2d 589, 595 & n.12 (E.D. Va. 2003) (noting that defendant's sale of copyrighted products bearing plaintiff's trademark in Virginia satisfied third *ALS Scan* prong).

14

court "conclude[d] that the cause of action ar[ose] out of [the defendant's] forum-related conduct," 952 F. Supp. at 1127, because "a cause of action for trademark infringement occurs where the passing off occurs," *id.* (quoting *Cottman Transmission Sys. Inc. v. Martino*, 36 F.3d 291, 294 (3d Cir. 1994)).

Under this authority, the Court finds that Plaintiff has made a prima facie showing that the third *ALS Scan* prong is satisfied. As this means that Plaintiff has made a prima facie showing for all three *ALS Scan* prongs, the Court finds that Plaintiff has carried its burden with respect to the purposeful availment prong of the overarching Fourth Circuit specific personal jurisdiction test. The Court therefore turns to the next prong of that overarching test: whether Plaintiff's claims arose out of Defendant's purposeful availment.

b.      Arising Out of Activities Directed at the State

The second prong of the Fourth Circuit's specific personal jurisdiction test "concerns to what extent [a defendant's] contacts with [the forum state] form the basis of the suit." *UMG Recordings*, 963 F.3d at 354. "The analysis here is generally not complicated. Where activity in the forum state is the genesis of [the] dispute, this prong is easily satisfied." *Id.* (quoting *Tire Eng'g*, 682 F.3d at 303).

As just discussed, Plaintiff has made a prima facie showing that Defendant directed electronic activity into North Carolina for the purpose of engaging in business in North Carolina, and this electronic activity created causes of action in North Carolina. Importantly, those causes of action created by Defendant's directed electronic activity are the same causes of action that Plaintiff here has sued on. There is no dispute that Defendant uses the allegedly infringing "SELF" mark on its website. (ECF No. 16 at 11.) Thus, Defendant's alleged

15

purposeful availment forms the basis of the suit presently before this Court, and the Court finds that Plaintiff has carried its burden for the second prong of the specific jurisdiction test.

c.     Constitutional Reasonableness

The third prong of the Fourth Circuit's specific personal jurisdiction test asks whether "the exercise of personal jurisdiction [is] constitutionally reasonable," and requires a Court to consider factors "includ[ing]: (1) the burden of the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 279 (4th Cir. 2009).

Here, neither party has presented an argument specific to this part of the Fourth Circuit's specific personal jurisdiction test. Instead, Plaintiff and Defendant treat this factor as satisfied or unsatisfied, respectively, based entirely on the factors previously discussed. (*See* ECF Nos. 16 at 10–16; 21 at 19.)

In the Fourth Circuit's most recent case applying *ALS Scan*, the court discussed *ALS Scan* within its treatment of the purposeful availment prong of its overarching specific personal jurisdiction test. *UMG Recordings*, 963 F.3d at 352–54. After finding the purposeful availment prong satisfied, the Fourth Circuit then addressed the "arising out of" prong, and then constitutional reasonableness. *Id.* at 354–55. Since the district court below had not analyzed reasonableness in the first instance, the Fourth Circuit remanded the case with instructions that the district court address it. *Id.* at 355. This Court, therefore, will analyze constitutional reasonableness separately from the issues already addressed. The Court turns now to the five constitutional reasonableness factors set out in *Consulting Engineers*.

16

For the first factor, the Court considers whether Defendant, which is based in Texas, is overly burdened by being haled into court in North Carolina. The Fourth Circuit case *CFA Institute* is instructive on this factor. *See* 551 F.3d at 296. In that case, the Fourth Circuit held that a defendant based in India was not overly burdened by having to defend itself in Virginia because it "ha[d] been able to secure counsel to represent its interests, and its litigation burden [was] thus no more substantial than that encountered by other entities that [chose] to transact business in Virginia." *Id.* Here, Texas is closer to North Carolina than India is to Virginia, and Defendant has retained counsel with a business address in North Carolina. Accordingly, this factor weighs in favor of a finding of reasonableness.

The Court next addresses the second factor, the interest of North Carolina in adjudicating this dispute. *CFA Institute* is instructive for this factor as well. *See id.* at 297. There, the plaintiff was a Virginia entity that had filed suit under the federal Lanham Act as well as Virginia law. *Id.* The Fourth Circuit held that "Virginia [had] a valid interest in the resolution of the grievances of its citizens and businesses, particularly when they potentially involve issues of Virginia law." *Id.* Here, Plaintiff is a North Carolina entity, (ECF No. 1 ¶ 1), and it has brought claims including a claim under the Lanham Act, (*id.* ¶¶ 58–68), and claims under North Carolina state law, (*id.* ¶¶ 69–87). Thus, North Carolina has an interest in adjudicating this dispute, and the second factor therefore also weighs in favor of a finding of reasonableness.

Regarding the third factor, the plaintiff's interest in obtaining convenient and effective relief, this factor also weighs in favor of a finding of reasonableness because Plaintiff has brought this action in its home state. *Lillie v. Guerra*, 559 F. Supp. 3d 464, 475 (M.D.N.C.

2021) (finding third factor supported reasonableness because all plaintiffs were residents of North Carolina or had their principal place of business in North Carolina).

Finally, the fourth and fifth factors, that is, the shared interest of the states in obtaining efficient resolution of disputes and the interests of the states in furthering substantive social policies, do not weigh either for or against reasonableness. For the fourth factor, since Plaintiff is based in North Carolina while Defendant is based in Texas, neither state is obviously a more or less efficient forum overall as compared to the other for this litigation. As for the fifth factor, this case does not appear to implicate any specific substantive social policy that might differ between North Carolina and Texas.

Thus, several of the *Consulting Engineers* factors weigh decidedly in favor of reasonableness in this case, and no factor weighs against it. Accordingly, the Court finds that the exercise of personal jurisdiction over Defendant is prima facie constitutionally reasonable. Since the Court has previously found that Plaintiff carried its burden of showing that the claims in this case arose out of Defendant's purposeful availment of the privilege of doing business in North Carolina, the Court concludes that at this stage of the proceedings Plaintiff has established a prima facie showing that this Court has specific personal jurisdiction over Defendant for this case. The Court will therefore deny Defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(2).

### C. Venue

The Court now turns to Defendant's arguments for dismissal of this action pursuant to Federal Rule of Civil Procedure 12(b)(3) for improper venue. (ECF No. 16 at 17–20.)

Under the general venue statute, venue is proper in any judicial district "in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial

part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2); *see Savvy Rest*, 2019 WL 1435838, at *7 ("The Lanham Act has no special venue provision and thus the general venue statute is applicable." (quoting *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir. 1995))). "[I]n determining whether events or omissions are sufficiently substantial to support venue . . . , a court should not focus only on those matters that are in dispute or that directly led to the filing of the action." *Mitrano*, 377 F.3d at 405. "Rather, it should review 'the entire sequence of events underlying the claim.'" *Id.* (quoting *Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001))).

To argue why venue is not proper, Defendant reiterates one of its earlier personal jurisdiction arguments. As before, Defendant stresses that only 4.5% of its online business originates in North Carolina. (*See* ECF No. 16 at 19.) Defendant equates this to only 4.5% of the events giving rise to Plaintiff's claims occurring in North Carolina, and Defendant argues that this 4.5% is *de minimis*. (*Id.*) Defendant also highlights, again, that its operations are based in Texas, and adds that it has only two employees in North Carolina, both of whom work remotely. (*Id.* at 18–19.) In response, Plaintiff refers the Court to its corresponding personal jurisdiction counter-arguments. (ECF No. 21 at 22–24.)

Defendant's argument, which was not persuasive in the context of jurisdiction, is also not persuasive in the context of venue.

"In trademark infringement actions, the actionable wrong takes place both where infringing labels are affixed to the goods and where confusion of purchasers is likely to occur." *Make Up For Ever, S.A. v. SOHO Forever, LLC*, 198 F.R.D. 56, 61 (S.D.N.Y. 2000); *see also Savvy Rest*, 2019 WL 1435838, at *8 ("[A]ppellate courts have held that a 'substantial part' of the events giving rise to [trademark infringement] claims occurs in any district where consumers

are likely to be confused by the accused infringement, 'whether that occurs in one district or in many.'" (quoting *Cottman*, 36 F.3d at 295)).  "Confusion of customers occurs where the passing off occurs, that is, 'where the deceived customer buys the defendant's product in the belief that he is buying the plaintiffs.'"  *Kaia Foods, Inc. v. Bellafiore*, 70 F. Supp. 3d 1178, 1184 (N.D. Cal. 2014) (quoting *Sykes Lab'y, Inc. v. Kalvin*, 610 F. Supp. 849, 860 n.8 (C.D. Cal. 1985)).  Thus, venue may be proper where a defendant operates a website and makes "relatively modest sales" in a district, or where a defendant conducts "advertising activities that are aimed at [a] district, even if there is no evidence that actual sales of the allegedly infringing product have occurred."  *Id.*; *see also* 6 McCarthy on Trademarks and Unfair Competition § 32:64 (5th ed.) ("[A]ny place where there are sales or advertising of the accused goods or services . . . is a place where the events giving rise to trademark infringement occur: any such place is a proper site of venue.").

Here, Plaintiff has made a prima facie showing that Defendant advertises in North Carolina, that Defendant makes sales in North Carolina, and even that there are actual confused consumers in North Carolina.  Regarding advertising, Plaintiff has submitted a declaration of a North Carolina resident who states that while watching television in North Carolina he has personally seen advertisements for Defendant's services that use Defendant's allegedly infringing mark.  (ECF No. 22 ¶ 15.)  Regarding sales, Defendant concedes that it has tens of thousands of North Carolina customers.  (ECF Nos. 17 ¶ 20; 25 at 5–6.)  Finally, regarding actual confused customers, Plaintiff claims that it has analyzed the phone numbers of callers who contacted Plaintiff while attempting to reach Defendant, and its analysis shows that some of these callers are calling from North Carolina phones.  (ECF Nos. 21 at 18; 22 ¶ 13.)  Taking these facts in the light most favorable to Plaintiff, *Aggarao*, 675 F.3d at 366, the

Court finds that Plaintiff has carried its burden to resist dismissal for improper venue by making a prima facie showing that it is likely that there is consumer confusion in North Carolina, *cf. Savvy Rest*, 2019 WL 1435838, at *8 (finding venue was proper based on online sale and subsequent physical delivery of fifty mattresses to Virginia residents over prior five years).

The Court notes that Defendant's brief cites over half a dozen cases that appear to stand for a contrary proposition—that venue will not lie unless a high proportion of a defendant's sales occur in a district. (ECF No. 16 at 19–20). However, all but one of these cases were decided prior to 1990. (*Id.*) Before 1990, 28 U.S.C. § 1391 did not include the provision that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred"; Congress added this language in the Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 311(1), 104 Stat. 5089, 5114. *Mitrano*, 377 F.3d at 405 (discussing history of § 1391 and the 1990 amendments). The pre-1990 version of § 1391 "encouraged an approach that a claim could generally arise in only one venue." *Cottmann*, 36 F.3d at 294. In contrast, the 1990 amendments made it "possible for venue to be proper in more than one judicial district." *Mitrano*, 377 F.3d at 405. Accordingly, Defendant's pre-1990 cases are not useful here. As for the single post-1990 case that Defendant cites, the Court has reviewed this case and has found that it does not support Defendant's position, as the court's analysis in that case does not address the percentage of sales that the defendant had in the proposed district. *See Ultrasonic Power Corp. v. Cleaning Techs. Grp.*, No. 17 C 50308, 2018 WL 11197101 (N.D. Ill. June 19, 2018) (cited by ECF No. 16 at 19).

Accordingly, the Court will deny Defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(3).

## III. TRANSFER

Finally, the Court turns to Defendant's contention that, if venue is proper under 28 U.S.C. § 1391(b)(2), this Court should nevertheless transfer this case to the Western District of Texas pursuant to 28 U.S.C. § 1404(a).[4] (ECF No. 16 at 21–24.)

Under 28 U.S.C. § 1404(a), even if venue is proper in a district, a district court may still transfer "any civil action to any other district or division where it may have been brought or to any district or division to which all parties have consented" for "the convenience of the parties and witnesses, [and] in the interest of justice." "If a defendant files a motion to transfer under [28 U.S.C. § 1404(a)], the Court makes two inquiries: (1) whether the plaintiff's claims might have been bought in the court where it is to be transferred; and (2) whether the interests of justice and the convenience of the parties and witnesses justify transfer to that district." *Trinh v. Int'l Bus. Machs. Corp.*, No. 21-CV-105, 2022 WL 879680, at *3 (M.D.N.C. Mar. 2, 2022), *report and recommendation adopted*, No. 21-CV-105, 2022 WL 875699 (M.D.N.C. Mar. 24, 2022)). "The phrase 'where it might have been brought' . . . refers to a forum where venue originally would have been proper for the claim and where a defendant originally would have been subject to personal jurisdiction." *Id.* (quoting *Kotsonis v. Superior Motor Express*, 539 F. Supp. 642, 645 (M.D.N.C. 1982)). "To assess the convenience of the parties and witnesses, as well as the interest of justice," the Court considers many factors. *Id.* at *4. Those factors are:

---

[4] Defendant has also argued that this Court should transfer this case pursuant to 28 U.S.C. § 1406(a). (ECF No. 16 at 20–21.) While both § 1404(a) and § 1406(a) allow a court to transfer a case to another venue, § 1404(a) applies when a suit is filed in a district court where venue is proper and § 1406(a) applies when a suit is filed in a district court where venue is not proper. Richard D. Freer, 15 Fed. Prac. & Proc. Juris. § 3842 (4th ed.). Since this Court has found that venue is proper in the Middle District of North Carolina, the Court analyzes Defendant's request for transfer under § 1404(a).

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws.

*Speed Trac Techs., Inc. v. Estes Express Lines, Inc.*, 567 F. Supp. 2d 799, 802 (M.D.N.C. 2008) (quoting *Plant Genetic Sys.*, 933 F. Supp. at 527). "The moving party bears the burden of proving that the balance of these factors weighs in favor of transfer." *Id.* at 803 (quoting *Sweeney v. Pa. Nat'l Mut. Cas. Ins. Co.*, No. 05-CV-931, 2007 WL 496699, at *2 (M.D.N.C. Feb. 27, 2007)). "[T]he analysis of these factors is qualitative, not merely quantitative." *Id.* (quoting *Com. Equip. Co. v. Barclay Furniture Co.*, 738 F. Supp. 974, 976 (W.D.N.C. 1990)). "A 'court should refrain from transferring venue if to do so would simply shift the inconvenience from one party to another.'" *Id.* (quoting *Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 841 F. Supp. 719, 721 (M.D.N.C. 1993)).

Here, Defendant argues that transfer is appropriate because Defendant resides in Texas while Plaintiff "admittedly has physical locations in at least eight different states and conducts business in even more states and online." (ECF No. 16 at 23.) According to Defendant, this means that litigating this case in the North Carolina would require both parties to transport the relevant documents, information, and witnesses to North Carolina from across the country. (*Id.*) In contrast, Defendant proposes that Texas is conveniently "in the middle of the country and, therefore, in the middle of [Plaintiff's] California and North Carolina offices," thus making it a logistically easier location for this litigation. (*Id.*) This argument is not persuasive.

23

As alleged in the Complaint, Plaintiff brought this suit in part because so many people contact Plaintiff's customer support call center in error while attempting to contact Defendant that the confusion disrupts Plaintiff's ability to serve its own customers. (ECF No. 1 ¶ 41.) Plaintiff has also submitted evidence that the call center at issue is in Durham, North Carolina, and that a portion of the confused callers are calling from North Carolina phone numbers. (ECF No. 22 ¶ 13.) Thus, it is likely that there is a concentration of relevant evidence and witnesses in North Carolina. Moreover, while Plaintiff has indeed represented that its affiliated organizations have operations in eight states, Texas is not one of those states. (ECF No. 1 ¶ 11.) Of the parties in this litigation, only Defendant is in Texas. Defendant seeks solely its own benefit, at the expense of others. This does not justify transfer. *See Tools USA*, 841 F. Supp. at 721.

Finally, Defendant also briefly argues that the enforceability of a judgment factor weighs in in favor of Texas since its property and assets are in Texas. (ECF No. 16 at 24.) However, this argument is not persuasive because Defendant has not provided any explanation why a judgment rendered by this Court could not reach Defendant in Texas.

Accordingly, although the Western District of Texas would have personal jurisdiction over Defendant in Texas, Defendant has not carried its burden of justifying a transfer under 28 U.S.C. § 1404(a). The Court will therefore deny Defendant's motion to transfer.

For the reasons stated herein, the Court enters the following:

## ORDER

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss, (ECF No. 15), is **DENIED**.

This, the 6th day of February 2023.

/s/ Loretta C. Biggs
United States District Judge